E-FILED on: 9/29/09

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GREGORY L. SMITH,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,[1] Commissioner of Social Security,<br><br>    Defendant. | No. C-06-01922 RMW<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 9, 16, 19]** |

Plaintiff Gregory Smith ("Smith") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits. Smith filed this action pursuant to 42 U.S.C. § 405(g) on March 13, 2006. He has filed a motion for summary judgment and/or remand. The Commissioner opposes the motion and also moves for summary judgment. The court has considered the moving and responding papers and the

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue, who became the Commissioner of Social Security on February 12, 2007, is substituted as defendant in this action.

ORDER DENYING PLAINTIFF'S  MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER

entire administrative record. For the reasons set forth below, the court denies Smith's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

## I. BACKGROUND

Smith's disability insurance benefits expired on June 30, 2001. Tr. 113 ¶ 1. At that time, he was 47 years old. Tr. 111.

**A.     Smith's Knee Injury**

Smith completed high school and finished about one year of college. Tr. 159. Over the years, Smith worked as a cook, delivered mail, jogged paper for a publisher, audited inventories and did manual labor. Tr. 166. Smith's final job, which he was working at the time of his injury, was with Dias Trenching, Inc. Tr. 166-167.[2] Generally, Smith repaired underground wiring by pulling old wiring out, repairing the pipe, and then filling the trench with a shovel. *See* Tr. 167.

On December 1, 2000 Smith was working in a trench at a job in Half Moon Bay when something happened. *See* Tr. 210. In his report to his doctor, Smith said that the trench's walls caved in and trapped his right leg until the backhoe driver was able to pull him out. Tr. 208. Other portions of the record indicate that when Smith was removing a stomper from the trench, the stomper hit his knee. Tr. 210. Regardless, Smith hurt his knee and could not return to work. *Id.*

Smith went to the doctor on January 23, 2001. Tr. 208. Dr. Robert T. Badke observed that Smith suffered pain in his right knee, that the knee snapped and popped and that Smith's knee was locking up. *Id.* Dr. Badke diagnosed Smith as suffering from a torn meniscus or damaged ACL and ordered an MRI on Smith's knee. *Id.* Until the MRI could reveal the source of Smith's knee problems, Dr. Badke ordered Smith not to work. *Id.*

Smith received an MRI from Dr. Richard L. Mattson on February 3, 2001. Tr. 206-207. Dr. Mattson concluded that Smith's ligaments appeared intact, but that Smith's medial meniscus showed signs of damage. *See id.* Dr. Badke reviewed the MRI and saw Smith on February 12, 2001. Tr. 204. Smith still suffered from pain and had limited range in his right knee. *Id.* Dr. Badke believed

---

[2]     In his paperwork, Smith identified his employer as "Diaz Trenching." The other files in the record indicate that Smith's employer was Dias Trenching, Inc. *See, e.g.,* Tr. 208-210.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                                2

1   that Smith tore his medial meniscus and that it could be corrected with arthroscopic surgery. *Id.* In
2   the meantime, he prescribed painkillers and anti-inflammatories to ease Smith's symptoms. *Id.*

3   Dr. Badke performed the arthroscopic surgery on April 12, 2001. Tr. 202-03. The surgery
4   revealed that Smith had torn both his medial and lateral menisci and damaged some chondral tissue.
5   Tr. 202. Dr. Badke repaired the menisci and chondral tissue, observed that Smith's ligaments were
6   intact, and scheduled a follow-up for about a week later. Tr. 203.

7   Following the surgery, Smith underwent physical therapy. *See* Tr. 191-201. Dr. Badke saw
8   Smith on June 12, 2001 and observed that "[h]e was making good progress with his physical
9   therapy." Tr. 190. Dr. Badke believed that he had "reached maximum medical improvement," but
10  he agreed to the physical therapist's request to have Smith undergo two more weeks of physical
11  therapy. *Id.* Dr. Badke intended to see Smith after those two weeks, at which point he projected that
12  Smith would "be able to return to work with having reached maximum medical improvement" and
13  that his return to work would be "without any restrictions." *Id.*

14  Things did not go as anticipated. When Dr. Badke next saw Smith on July 3, 2001, Smith
15  complained that his right knee was snapping and popping again. *See* Tr. 189. Dr. Badke observed
16  that Smith's knee had a restricted range of motion and was clicking. *Id.* Dr. Badke requested a
17  second MRI on the knee to diagnose the cause of the setback. *Id.*

18  By the end of August 2001, Smith received a second MRI, and a different doctor analyzed
19  the results. *See* Tr. 187. Dr. Joseph Dixon observed that Smith's knee generally appeared normal,
20  including the repaired lateral meniscus. *Id.* However, Dr. Dixon noted what he believed was a tear
21  of the posterior medial meniscus. *Id.* The record is silent for a period following Dr. Dixon's letter to
22  Dr. Badke regarding this diagnosis.

23  The next entry in the record notes that Dr. Badke saw Smith on November 5, 2001. Tr. 185-
24  86. Dr. Badke noted that "[s]ince his last return to my office he has attempted to return to work on
25  9-17-01." Tr. 185. This suggests that Dr. Badke had not seen Smith for at least two and a half
26  months, and it is possible that Dr. Badke had not seen Smith following the second MRI. Dr. Badke
27  reported that Smith was "still complaining of some increasing pain in his knee." *Id.* Dr. Badke
28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                   3

1 explained that he had reviewed Dr. Dixon's diagnosis of the second MRI and agreed that it appeared
2 that Smith had a small tear of the posterior medial meniscus. *Id.* This area of the meniscus had not
3 been addressed during the arthroscopy. *Id.*

4       Based on his observations, Dr. Badke concluded that "[t]here's obviously been an additional
5 problem that's occurred in the area of the injured right knee." *Id.* Dr. Badke characterized it as "a
6 very minor problem at first" that had progressed to become "a major problem for instability, pain
7 and popping in [Smith's] knee." *Id.* This led Dr. Badke to seek to perform a second arthroscopic
8 surgery to repair the tear of the posterior medial meniscus. *Id.*

9       Dr. Badke performed the second arthroscopic surgery on February 1, 2002. Tr. 233-36. In a
10 pre-surgery report, Dr. Badke noted that the second surgery was necessary because Smith "went
11 back to work and was doing fine, but had a re-injury and then had a repeat MRI done and this
12 showed a tear of the posterior horn of the medial meniscus." Tr. 235. He further noted that the tear
13 "was not seen on the previous arthroscopy, so this is a new injury." *Id.* During the surgery, Dr.
14 Badke inspected Smith's menisci and ligaments and repaired the medial meniscus. Tr. 233-34.

15       Following Smith's knee problems (and long after Smith's "date last insured" or "DLI" of June
16 30, 2001), Smith sought treatment for additional ailments, including back pain, shoulder pain, and
17 for cervical spine impairments. *See, e.g.*, Tr. 76, 276, 287, 299.

18       **B.**     **Smith's Application for Disability Benefits and Hearing**

19       Smith applied for disability insurance benefits on February 19, 2003. Tr. 107, 142-43. The
20 Administrative Law Judge ("ALJ") held a hearing on Smith's application on October 5, 2004. Tr.
21 107. Smith testified at the hearing, as did Darlene T. McQuary, an impartial vocational expert, who
22 testified regarding the job market. *Id.*

23       McQuary testified as a vocational expert regarding the job market for people with Smith's
24 education, no transferable skills, and a limitation to light work and a further limitation to only
25 occasional kneeling, crouching and crawling, and the need for a sit/stand option. *See* Tr. 442-443.
26 McQuary stated that a person assumed to have those limitations could work as a parking lot

27
28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                4

attendant, a clerk or cashier, or reception-type security or surveillance systems monitor, which exist in significant numbers in the regional economy. Tr. 443.

The ALJ also considered the report of Dr. Anne M. Khong, a non-examining physician who opined on Smith's residual functioning capacity as of June 30, 2001 based on the medical record. Dr. Khong believed that Smith had both exertional and postural limits on his ability to work, noting that he could only stand or walk for two hours in a normal workday and that he could sit for about six hours. Tr. 337. Dr. Khong also believed that Smith could occasionally climb a ramp or stairs, but that he should never kneel, crouch, crawl or climb any ladders or ropes. Tr. 338.

### C. The ALJ's Findings and Conclusions

The ALJ issued an unfavorable decision on December 1, 2004, finding that Smith was not disabled prior to his date last insured of June 30, 2001. *See generally* Tr. 104-14. The ALJ first found that Smith had not been working since the alleged onset of disability. Tr. 113 ¶ 2. The ALJ next found Smith had suffered a knee injury that constituted a "severe" impairment. Tr. 113 ¶ 3. Because Smith's "severe impairment" was not medically equal to a listed impairment, the ALJ could not presume that he was disabled. Tr. 113 ¶ 4. The ALJ also found Smith's testimony that his pain was disabling to be only partially credible because no evidence indicated that his knee injury was continuously disabling for 12 months or more. Tr. 113 ¶ 5. Furthermore, the ALJ concluded that Smith's knee injury had improved by June 30, 2001 and that he suffered a second knee injury (and his other ailments) after June 30, 2001, his date last insured. Tr. 113 ¶ 6.

Though Smith was unable to perform his past work as of June 30, 2001, (Tr. 113 ¶ 8), the ALJ concluded that Smith could perform "light work with occasional kneeling, crouching and crawling and a sit/stand option." Tr. 113 ¶ 7. Based on Smith's abilities and education and the testimony of the vocational expert, the ALJ found that Smith could perform a significant range of light work. Tr. 113 ¶¶ 9-13. Because Smith could perform this other work, the ALJ concluded that as of June 30, 2001, Smith was not disabled. Tr. 114 ¶ 14. Smith requested review by the Social Security Administration's appeals council, but the council denied his appeal. *See* Tr. 5-9. Smith then filed this case pursuant to 42 U.S.C. § 405(g) on March 13, 2006.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                   5

## II.  ANALYSIS

Smith finds error with the ALJ's denial of benefits in five respects.  Smith contends that no substantial evidence supports the ALJ's finding that he could perform light work or that his knee injury lasted less than a year.  He also takes issue with the ALJ's discounting of his pain testimony and medical evidence after June 30, 2001.  Finally, Smith argues that there is no substantial evidence to support the ALJ's step-five finding that other work existed that Smith could have performed in June 2001.

### A.     Legal Standard

The findings of the Commissioner are reviewed for legal error or factual findings that are not supported by substantial evidence.  *Sprague v. Bowen*, 812 F.2d 1227, 1229 (9th Cir. 1987). Substantial evidence is more than a scintilla but less than a preponderance.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  Still, the court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion."  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).

### B.     The ALJ's "Light Work" Finding

Smith first argues that no substantial evidence supports the ALJ's finding that Smith could perform "light work."  Motion at 10.  He notes that the ALJ's residual functional capacity determination was expressly based upon the assessment by the DDS non-examining medical expert, but that expert's report does not support a finding of an ability to perform light work. Specifically, "light work" requires the ability to stand or walk for about six hours in an 8-hour work day, but Dr. Khong's assessment reports that Smith could stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour day.  Tr. 337.  She did not determine that Smith was able to stand or walk for about 6 hours of an 8-hour day.  *Id.*

Plaintiff does not cite any legal authority to support his argument, but he is correct.  Under SSR 83-10, in order to perform the full range of light work, the individual must be able to stand or

1  walk, off and on, for a total of 6 hours in an 8-hour day. SSR 83-10, at 5. Dr. Khong estimated that
2  Smith could only stand for 2 hours in an 8-hour day, a limitation more appropriate for a finding of an
3  ability to perform sedentary work, rather than light work. *Id.* Smith's ability to lift and carry 10
4  pounds frequently and 20 pounds occasionally, however, fall within the "light work" range. *Id.*; Tr.
5  433. Thus, Dr. Khong's assessment of Smith's capacity does not support a finding that Smith had the
6  residual functional capacity to perform the full range of light work.

7  Nevertheless, plaintiff overstates the record, because the ALJ did not find that Smith was
8  able to perform the full range of light work. Instead, the ALJ concluded that Smith retained the
9  residual functional capacity to perform light work, but noted that "the claimant's capacity for the full
10 range of light work prior to the expiration of his insured status was diminished due to occasional
11 kneeling, crouching and crawling and the requirement for a sit/stand option." Tr. 111. Each of these
12 limitations was included in the hypothetical posed to the vocational expert, who testified that a
13 person with such a residual functional capacity, as limited, and of claimant's age and educational and
14 vocational background, could perform the jobs of a parking lot attendant, a clerk or cashier, and
15 reception-type security or surveillance systems monitor, which exist in significant numbers in the
16 regional economy. Tr. 442-443.

17 The ALJ's residual functional capacity finding, as presented in his hypothetical to the
18 vocational expert, included the ability to perform light work, but further limited to only occasional
19 kneeling, crouching and crawling, and the need for a sit/stand option. ER 442. Substantial evidence
20 supports this finding, which was narrower than "light work" alone.

21 **C.  Duration of the Knee Injury**

22 Smith's next argument is that the ALJ's findings regarding the duration of Smith's right knee
23 impairment was not supported by substantial evidence. Motion at 11. Smith takes particular issue
24 with the ALJ's finding that there was a second injury to Smith's knee after his date last insured, as
25 not being supported by substantial evidence in the record.

26 In making her finding that there was a second injury to the knee after the expiration of
27 Smith's insured status, the ALJ refers to medical records from plaintiff's treating physician, including

1  a November 5, 2001 referring to "an additional problem that has occurred in the area" (Tr. 185) and
2  a February 1, 2002 report referring the "re-injury" of the knee.  Tr. 235.  Plaintiff argues that this
3  was error because Dr. Badke's statements were "misinformed."  Reply at 6.  Plaintiff has not cited
4  any evidence in support of this contention, however.  The statements by Smith's treating physician
5  are a sufficient basis from which the ALJ could conclude that there was a subsequent injury to the
6  knee.

7  Less clear, however, is whether there is any basis to conclude that this subsequent injury
8  occurred after the date last insured.  The date last insured was June 30, 2001, a Saturday.  On July 3,
9  2001, (the following Tuesday), plaintiff returned to Dr. Badke complaining of popping and snapping
10 in his right knee, with a restricted range of motion.  A further MRI revealed a tear, and further
11 arthroscopic surgery was eventually performed.  The ALJ offers no explanation for how she
12 determined that this further injury occurred after the date last insured.

13 Assuming the ALJ erred in finding that there was a subsequent, post-DLI injury to the right
14 knee, however, plaintiff has not established that the ALJ erred in finding him not disabled as of his
15 date last insured.[3]  In order to be disabling, an impairment must be expected to last for at least 12
16 months, but it also must be severe enough to preclude substantial gainful activity.  42 U.S.C.
17 §423(d)(1)(A).  The fact that an impairment meets the 12-month durational requirement, standing
18 alone, is not sufficient to establish disability.  Moreover, the ALJ's determination that Smith was not
19 disabled was not based on a failure to meet the 12-month durational requirement.

20 **D.     Discounting Plaintiff's Symptom Testimony**

---

[3] In a footnote, Smith argues that the ALJ applied the wrong legal standard in her Finding No. 5, specifically, that she used an incorrect application of the duration requirements in finding that there was no evidence that claimant's knee injury prior to June 30, 2001, was continuously disabling for 12 months or more" which plaintiff reads to mean that the injury was required to be disablingly severe for a continuous period of twelve months prior to the expiration of plaintiff's insured status. Motion at 14 n.11.  Earlier in her decision, however, the ALJ properly phrased the issue, noting that "the issue in this case is whether the claimant was disabled for 12 continuous months or more beginning prior to the expiration of his insured status...."  Tr. 109.  The ALJ's inartful articulation of the standard as set forth in her Finding No. 5 does not require remand.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                       8

1    Smith next argues that the ALJ erred in her treatment of Smith's testimony, specifically in
2 failing to follow the required two-step analysis for rejecting subjective symptom testimony and in
3 failing to articulate clear and specific reasons for discrediting the testimony.

4    Plaintiff contends that the ALJ erred in her treatment of plaintiff's subjective testimony and
5 failed to follow the required analysis required by SSR 96-7p and case law.  Motion at 13.  Plaintiff
6 argues that he testified at the hearing "about his symptoms and limitations, including knee, low back,
7 neck/arm and other pain starting in December 2000" (Tr. 438-439) and that he had submitted forms
8 to the Commissioner regarding his symptoms and limitations "with statements about pain,
9 limitations, and limited daily activities."  Motion at 13, citing to Tr. 174, 176, 180 and 183.

10    The ALJ found that Smith's testimony was only "partially credible."  The ALJ specifically
11 credited Smith's testimony regarding having incurred an occupational knee injury in December 2000
12 and that he underwent surgery to repair the knee in April 2001.  The ALJ specifically did not credit
13 Smith's testimony regarding his statements of ongoing disability after April 2001.  Tr. 110.  The
14 ALJ's stated reason was that the testimony was not supported by the medical record.  Tr. 110.  The
15 ALJ noted that Dr. Badke was prepared to release Smith back to work in mid-June 2001, and
16 concluded that Smith had "medically improved" after his initial surgery in April 2001.  The ALJ also
17 noted that the subsequent injury to plaintiff's knee occurred after the expiration of his insured status,
18 and concluded that "any disability relating to the claimant's knee injuries and surgeries were not
19 continuous."  Tr. 110-111.

20    Plaintiff is thus correct in that the ALJ did not engage in the proper analysis for assessing
21 subjective symptom testimony.  Confronted with subjective symptom testimony, the ALJ was
22 required to must engage in a two-step analysis.  First, the claimant must produce objective medical
23 evidence of an underlying impairment or combination of impairments which could reasonably be
24 expected to produce pain or other symptoms alleged.  *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th
25 Cir. 1986); *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc); *Smolen v. Chater*, 80
26 F.3d 1273, 1282 (9th Cir. 1996). When the claimant has done so, then absent evidence of
27 malingering, the ALJ may reject the testimony about the severity of the symptoms only by offering
28

ORDER DENYING PLAINTIFF'S  MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                                 9

specific, clear and convincing reasons for doing so. *Smolen*, 80 F.3d at 1282; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). In making a credibility determination, the ALJ may consider the medical evidence as well other factors, including a claimant's daily activities, the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; measures used to relieve symptoms; and functional limitations caused by the symptoms. *Smolen*, 80 F.3d at 1284; 20 C.F.R. §404.1529(c)(3). The ALJ did not do so in this case, however, and the only reason stated for discrediting plaintiff's statements regarding ongoing disability after April 2001 was that the testimony was not supported by the medical record. Tr. 110.

Ordinarily, this would be inadequate and would be sufficient ground to remand, but in the present case, the error was harmless. The testimony identified by Smith which the ALJ discredited is remarkably generic and lacking in any degree of specificity with regard to the extent of the symptoms or their disabling impact on the claimant. The cited hearing testimony, for example, was that Smith felt pain in his back a couple of weeks after the accident, that after his first surgery he was limited in his ability to walk, bend and pick things up, and that following his first knee surgery, there were times that plaintiff had fallen because his leg had given out. Tr. 438-39. Similarly, the written statements identified by plaintiff was that plaintiff felt numbness on his right side, was unable to sleep at night, and was unable to "walk far," was unable to sit too long, or stand too long because of numbness, or walk too far, and could not run or jog at all, and finally, that plaintiff could not "move or function normally." Tr. 174, 176, 180.

Nothing within plaintiff's testimony contradicts Dr. Khong's functional capacity assessment or the residual functional capacity as determined by the ALJ. Thus, even if the ALJ had completely credited Smith's testimony, the testimony does not undermine the ALJ's determination regarding plaintiff's residual functional capacity: an ability to perform light work with occasional kneeling, crouching and crawling, and a sit/stand option. Accordingly, any error by the ALJ in not fully crediting plaintiff's testimony was harmless.

**E.     Disregarding as Immaterial Post-DLI Medical Evidence**

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                              10

Smith's final argument is that the ALJ erred in disregarding the medical evidence after June 30, 2001 as immaterial, and failed to consider the other impairments for which plaintiff "was treated mostly after his date last insured." Motion at 15. Plaintiff proceeds to review the medical record, noting that his lumbar spine problems were caused by or related to the knee injury and that his subsequent shoulder, back and neck treatments in 2001 through 2003 were a direct result of the December 2000 accident. Motion at 16. Plaintiff argues that all of his impairments are related to his knee injury, or relate back to the same accident that occurred in December of 2000 and notes that in the workers compensation litigation, the parties ultimately stipulated that the right shoulder injury was also a result of the December 2000 injury. From this, he argues that the ALJ's finding that the neck, lumbar and shoulder impairments were all 'new impairments' after his DLI was countered by this medical and legal evidence and those findings should not be affirmed." *Id.* Plaintiff goes on to argue:

> Even if the effects of those impairments were mostly new after the DLI, later impairments and medical evidence about them can become material to a claimant's disability claim where there are changes in calculation of a claimant's last date of disability insurance coverage. If an individual is found subject to a period of disability beginning before disability coverage ends, [the Commissioner] stops counting the elapsed years, as of the year in which the period began, so that the individual's date last insured moves later on the calendar. Here, if Plaintiff were found disabled beginning in December 2000, his last date insured would have changed from June 30, 2001 to at least one year later, and maybe more than one year later, if it were found that Plaintiff's knee impairment or other impairments from the trench collapse injury kept him from working on and after the DLI. Later insured coverage would include dates in 2002 and 2003 when Plaintiff's functioning was significantly affected by his cervical spine, shoulder an arm limitations, and would also possibly include his low back dysfunction.

Motion at 16-17.

The fundamental flaw in plaintiff's argument, however, is that the medical record does not establish that plaintiff's impairments were sufficiently severe as of June 30, 2001, to have rendered him disabled within the meaning of the Act. Moreover, the argument concedes that many of plaintiff's symptoms did not arise until after June 30, 2001.

Plaintiff has not established that the ALJ erred in her treatment of the medical record relating to injuries and treatment after June 30, 2001.

### F. Step-Five Determination

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                                                                 11

Plaintiff's final argument is that the ALJ erred in finding plaintiff to be not disabled on the basis that there were significant numbers of jobs available that plaintiff could perform. Plaintiff suggests that it was improper for the ALJ to have relied on a "grid" rule and that it was also improper to have relied on the vocational expert's testimony because the testimony was based on a flawed hypothetical. Motion at 18. Plaintiff does not elaborate on these arguments.

The ALJ's hypothetical posed to the vocational expert encompassed all of the limitations the ALJ found to be present. Since plaintiff has not established that the ALJ's residual functional capacity determination was erroneous, he has also failed to establish any error in the hypothetical posed to the vocational expert. Accordingly, there is no basis for challenging the ALJ's step-five determination that a significant number of jobs existed in the national economy that plaintiff could perform.

### IV. ORDER

For the foregoing reasons, Smith's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

DATED:     9/29/09

RONALD M. WHYTE
United States District Judge

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                          12

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

James Hunt Miller                    jim_miller0@yahoo.com

**Counsel for Defendants:**

Sara Winslow                         sara.winslow@usdoj.gov
Peter Thompson                       peter.thompson@ssa.gov

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**     9/29/09                                             TER
                                                         **Chambers of Judge Whyte**

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
No. C-06-01922 RMW
TER                                          13